IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

DIANTHIA FORD-KEE                                                                              PLAINTIFF

v.                                                              CIVIL ACTION NO. 4:23-cv-107-SA-JMV

MISSISSIPPI VALLEY STATE UNIVERSITY and
MISSISSIPPI BOARD OF TRUSTEES OF
STATE INSTITUTIONS OF HIGHER LEARNING                                        DEFENDANTS

ORDER AND MEMORANDUM OPINION

On June 12, 2023, Dianthia Ford-Kee initiated this civil action by filing her Complaint [1]

against Mississippi Valley State University ("the University") and the Mississippi Board of

Trustees of State Institutions of Higher Learning ("IHL"). The Complaint [1] brings claims for age

discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et*

*seq.*; and gender discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e,

*et seq*. Before the Court is the University and IHL's joint Motion for Summary Judgment [49].

The Motion [49] has been fully briefed and is ripe for review.[1] Having considered the parties'

filings, as well as the applicable authorities, the Court is prepared to rule.

*Relevant Background*

On November 18, 2013, the University's then-President William Bynum appointed Ford-

Kee, who was 52 years-old at the time, as the University's Athletic Director. Ford-Kee was the

first woman appointed to the position of Athletic Director in the University's history.[2] She was

not given a contract but was instead an at-will employee of the University. In 2017, after serving

---

[1] The Court notes that Ford-Kee originally asserted other claims but has since withdrawn them. She also
concedes that IHL is not her employer and agrees that IHL should be dismissed as a party to this lawsuit.
[2] Although the first woman to serve as Athletic Director at the University, Ford-Kee had previous
experience in this line of work having served as the Athletic Director at Lincoln University in Pennsylvania
prior to moving to Mississippi to join the University in 2013.

as the Executive Vice President and Chief Operating Officer, Jerry Briggs became the new President of the University. Upon assuming his new position, Briggs retained Ford-Kee in her position as Athletic Director.

In her role as Athletic Director, Ford-Kee oversaw a variety of the University's varsity sports, including baseball, football, soccer, basketball, tennis, softball, and volleyball. She oversaw the day-to-day operations of the athletic program and supervised all staff within the athletics department. This included providing recommendations to the President and respective committees for hiring and firing of staff within her department. Ford-Kee also managed the athletic programs' budget and fundraised as part of her job duties.

The University's athletic program was under review by the National Collegiate Athletic Association ("NCAA") when Ford-Kee first joined the University. In addition to a history of NCAA noncompliance issues, Ford-Kee alleges that the University's athletics teams had a history of losing before she came onboard. During Ford-Kee's tenure, the University secured its first ever cross-country division championship, as well as a division championship in women's soccer. She also contends that the University enjoyed widespread academic success among student athletes under her leadership. However, the athletics program continued to have an overall losing record during her time as Athletic Director. Ford-Kee does not necessarily dispute this fact but attributes it in large part to the University's lack of resources, including the state of its facilities and low salary budgets when compared to competing schools within the Southwestern Athletic Conference ("SWAC"). She argues that the lack of resources impeded her ability to recruit winning coaches and assistant coaches and that this also affected the coaches' recruitment of student athletes.

In November 2021, Briggs completed Ford-Kee's 2020-2021 performance review, which noted the underperformance of the University's athletics teams but nonetheless rated Ford-Kee as

either "exceptional" or "exceeding expectations" in all areas, including "work results." *See* [53], Ex. 6 at p. 2. Ford-Kee's previous employee reviews were all likewise favorable over the years. She had not been reprimanded by the University in any manner during her employment.

However, on February 8, 2022, Briggs requested to meet with Ford-Kee. She thought the purpose of this meeting was to discuss issues involving the men's basketball coach, Lindsey Hunter, based on information she received from Briggs earlier that day. Instead, during the meeting, Briggs informed Ford-Kee that her last day of employment would be March 31, 2022. Ford-Kee was placed on paid administrative leave, effective March 1, 2022, until her last day on March 31, 2022. Ford-Kee alleges that she did not expect to be notified of her termination at the February 8th meeting and thought that she was being terminated for bringing the issues related to Hunter "to light" and for "gender and age bias." *See* [53], Ex. 4 at p. 5. At the time of her termination, Ford-Kee was 62 years-old.

The University alleges that it terminated Ford-Kee for "demonstrated underperformance of [the University's] Athletics teams" during her nine-year tenure. *See* [50] at p. 28. It alleges that the athletic program's win/loss record is a reflection of Ford-Kee's performance as the Athletic Director. In other words, it alleges that Ford-Kee was terminated for poor job performance.

The University then conducted a national search for new Athletic Director and hired Hakim McClellan, a younger male, to fill the vacant position. McClellan was 35 years-old (approximately 27 years younger than Ford-Kee) at the time of his hire in June 2022.

Thereafter, on August 30, 2022, Ford-Kee filed an EEOC charge against the University. On September 5, 2022, approximately six days after Ford-Kee filed her EEOC charge, Briggs

submitted an employee evaluation of Ford-Kee to the University's human resources department.[3] This evaluation noted that Ford-Kee was no longer employed by the University, and provided an "improvement necessary" rating under "work results" and an "unsatisfactory" rating as to "creativity and innovation." *See* [53], Ex. 9 at p. 11, 16. Additionally, in this evaluation, Briggs noted that overall improvement in athletics was necessary.

In its response to the EEOC charge dated February 9, 2023, the University stated that the underperformance of teams was the reason for Ford-Kee's termination. Ford-Kee alleges that she first learned that she was terminated for this reason upon receiving a copy of the EEOC response. Though Ford-Kee and Briggs agree that they generally discussed the athletics' teams' performance over the years prior to Ford-Kee's termination, Ford-Kee avers that she was unaware that the teams' performance was a measuring tool for her own respective job performance.

Ford-Kee then filed the instant suit alleging that the University terminated her due to her age and gender. In their present Motion for Summary Judgment [49], the University and IHL contend that Ford-Kee was terminated solely due to poor performance of the athletics teams. Ford-Kee opposes the Motion [49].

*Summary Judgment Standard*

Summary judgment is warranted when the evidence reveals no genuine dispute regarding any material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at

---

[3] It is unclear to the Court whether Briggs was aware of the EEOC charge at the time he submitted this post-termination performance evaluation of Ford-Kee.

trial." *Nabors v. Malone*, 2019 WL 2617240, at *1 (N.D. Miss. June 26, 2019) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

"The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.'" *Id*. (quoting *Celotex*, 477 U.S. at 323, 106 S. Ct. 2548). "The nonmoving party must then 'go beyond the pleadings' and 'designate specific facts showing that there is a genuine issue for trial.'" *Id*. (quoting *Celotex*, 477 U.S. at 324, 106 S. Ct. 2548). Importantly, "the inferences to be drawn from the underlying facts contained in the affidavits, depositions, and exhibits of record must be viewed in the light most favorable to the party opposing the motion." *Waste Mgmt. of La., LLC v. River Birch, Inc.*, 920 F.3d 958, 964 (5th Cir. 2019) (quoting *Reingold v. Swiftships, Inc.*, 126 F.3d 645, 646 (5th Cir. 1997)). However, "[c]onclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments are not an adequate substitute for specific facts showing a genuine issue for trial." *Nabors*, 2019 WL 2617240 at *1 (citing *TIG Ins. Co. v. Sedgewick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002)) (additional citations omitted).

*Analysis and Discussion*

As previously noted, Ford-Kee is pursuing only two claims against the University—gender discrimination and age discrimination. The Court will address these claims in turn.

I.    *Title VII Gender Discrimination*

Ford-Kee brings a Title VII gender discrimination claim. In pertinent part, Title VII provides that:

> It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment,

5

> because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a)(1).

"An employee may rely on direct or circumstantial evidence to establish a prima facie case of discrimination under Title VII." *Arredondo v. Schlumberger Ltd.*, 583 F. Supp. 3d 783, 800 (W.D. Tex. 2022) (citing *Alvarado v. Tex. Rangers*, 492 F.3d 605, 611 (5th Cir. 2007)). Here, Ford-Kee relies on circumstantial evidence to establish her gender discrimination claim. *See* [54] at p. 15-16. Thus, the familiar burden-shifting framework set forth in *McDonnell Douglas* applies. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

Under the *McDonnell Douglas* framework, the burden is first on the plaintiff to create a presumption of gender discrimination by establishing a prima facie case. *Id*. at 802, 93 S. Ct. 1817. If the plaintiff establishes a prima facie case, then the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for its actions. *Id*. "The burden is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)). If the defendant articulates a legitimate, nondiscriminatory reason, then the ultimate burden rests on the plaintiff to prove the employment decision was the result of a discriminatory practice. *McDonnell Douglas*, 411 U.S. at 804, 93 S. Ct. 1817.

## A. Prima Facie Case

To establish a prima facie case of gender discrimination, Ford-Kee must show that "(1) she belongs to a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) she was replaced by someone outside her protected class." *Earle v.*

*Aramark Corp.*, 247 F. App'x 519, 523 (5th Cir. 2007) (citing *Manning v. Chevron Chem. Co.*, 332 F. 3d 874, 881 (5th Cir. 2003)).

The University does not dispute that Ford-Kee can satisfy all elements of her prima facie case—particularly, that she is within a protected class, that she was qualified to be an Athletic Director, that she was adversely affected by being terminated, and that she was replaced by a male, someone outside her protected class.

### B. Legitimate, Nondiscriminatory Reason

The University contends that it terminated Ford-Kee due to poor performance based on the University's athletics teams' underperformance and win/loss record during her tenure. *See* [53], Ex. 5 at p. 39-40. The parties do not dispute that this satisfies the University's burden to put forth a legitimate, nondiscriminatory reason for terminating Ford-Kee. *See Owens v. Circassia Pharms., Inc.*, 33 F. 4th 814, 826 (5th Cir. 2022). Thus, the Court will consider whether Ford-Kee has offered sufficient evidence that the University's proffered reason was pretextual or that her gender was a motivating factor in the University's employment action.

### C. Pretext or Motivating Factor

In the context of Title VII discrimination, Ford-Kee must prove that 1) the defendant's reason for her termination is not true, but is instead a pretext for discrimination (pretext alternative), or 2) the defendant's reason, though true, is only one of the reasons for its conduct, and any other motivating factor is the plaintiff's gender (mixed-motives alternative). *Davis v. Farmers Ins. Exch.*, 372 F. App'x 517, 519 (5th Cir. 2010) (citing *Laxton v. Gap Inc.*, 333 F. 3d 572, 578 (5th Cir.2003)).

As to pretext, Ford-Kee bears the burden of providing "substantial evidence" that the University's asserted reason for terminating her is a mere pretext for discrimination. *Owens*, 33

F.4th at 826 (citing *Watkins v. Tregre*, 997 F.3d 275, 283 (5th Cir. 2021)). "Evidence is substantial if it is of such quality and weight that reasonable and fair-minded [triers of fact] in the exercise of impartial judgment might reach different conclusions." *Id.* (quoting *Laxton*, 333 F. 3d at 579).

Ford-Kee points to circumstantial evidence from which, she argues, a jury can infer pretext and discriminatory intent. Alternatively, Ford-Kee argues that the evidence otherwise shows that her gender was a motivating factor in her termination. The Court will address these arguments in turn.

    *i.*   *Unworthy of Credence*

"A plaintiff may establish pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence." *Laxton,* 333 F. 3d 578 (citations and internal quotations omitted). "An explanation is false or unworthy of credence if it is not the real reason for the adverse employment action." *Id.* (citing *Sandstad v. CB Richard Ellis, Inc.*, 309 F. 3d 893, 899 (5th Cir.2002)).

Ford-Kee must present evidence that is "of sufficient 'nature, extent and quality' to permit a jury to reasonably infer discrimination." *Owens*, 33 F.4th at 826 (quoting *Crawford v. Formosa Plastics Corp., La.*, 234 F. 3d 899, 903 (5th Cir. 2000)). And crucially, Ford-Kee must provide more than a "mere scintilla" of evidence to show that the real reason for her termination was discriminatory animus. *Id.* at 834. "An aggrieved employee's evidence must, at the summary-judgment stage, permit a reasonable inference that the real reason was impermissible discrimination." *Id.* (citing *Sandstad*, 309 F. 3d at 899).

Here, Ford-Kee argues that there are four reasons the University's justification is unworthy of credence: 1) the athletics teams' losing records were not attributed to her job performance prior to her termination; 2) the University's proffered reason was documented post-termination and

post-EEOC charge; 3) inconsistencies in the University's proffered reason after commencement of litigation; and 4) contradictory statements in the University's EEOC position statement and Briggs' testimony relative to informing Ford-Kee of the reason for her termination.

As to the first contention, Ford-Kee argues that Briggs, the decision-maker in her termination, "had never considered [the] teams' historical losing records as a reason to criticize [her] work, much less terminate her." [54] at p. 16. She points to the November 2021 employee evaluation she received approximately three months prior to her February 8, 2022 meeting with him.

As noted, Briggs completed an evaluation of Ford-Kee in November 2021. The University's employee evaluation is titled "Performance & Behavioral Competencies." [53], Ex. 6 at p. 1. This evaluation rated Ford-Kee as either "exceptional" or "exceeding expectations" in all areas of her employment. *Id*. at p. 1-9.[4] Under "work results," Ford-Kee was given an "exceeds expectation" rating. *Id.* at p. 2.[5] In the comments section under "work results," Briggs noted that Ford-Kee "is a true team player and her work ethic supports my goals for the university; however, our athletic teams have underperformed for several years, which speaks to measuring Work Results." *Id.*[6]

Notably, there is another criterion in the November 2021 evaluation that is relevant here. The form describes "initiative/problem solving" as follows:

---

[4] The evaluated areas include "job knowledge/skills," "work results," "communications," "initiative/problem solving," "interpersonal relations," "work habits," "customer service," "accountability," "creativity and innovation," and "supervision/management." *Id*.
[5] According to the evaluation form, "work results" "[m]easures employee's results in meeting established objectives/expectations/standards of quality, quantity, customer service, and timeliness both individually and in a team." *Id*. An "exceeds expectation" rating is described as "[w]ork frequently exceeds expected quality, quantity, customer service, and timeliness standards[.]" *Id*.
[6] In addition to this notation, Briggs notes the teams' underperformance under the comment sections for "opportunities for development" and "overall performance" sections of the evaluation form. *Id*. at 9.

> Measures the extent to which the employee is self-directed, resourceful, and creative in performing job duties individually or in a team. Also measures employee's performance in identifying and resolving problems; following through on assignments; and initiating or modifying ideas, methods, or procedures to provide improved customer service, business processes, and accomplish duties. Employee's results in meeting established objectives/expectations/standards of quality, quantity, customer service, and timeliness both individually and in a team.

[53], Ex. 6 at p. 3.

Ford-Kee was also given an "exceeds expectation" rating under this area. *Id.* at p. 4.[7]

Briggs testified that at the time of the November 2021 evaluation he had not made the decision to terminate Ford-Kee. *See* [53], Ex. 2 at p. 17. He testified that he considered "the whole time span of [Ford-Kee] being the athletic director ultimately in making [his] decision" and that it was not based on a single incident. *Id*. at p. 16. This included the "lack of performance, [and] the fact that the athletics department was not progressing. The bringing in additional resources was not happening." *Id*. at p. 18.

When asked specifically about the November 2021 evaluation, Briggs testified as follows:

> Q.    Why did you mark her as exceeds expectations on that work results competency in 2021?
>
> A.    Because she was a very dedicated and extreme team player. She was. I really respected her work ethic. I know she put in a lot of effort, and I appreciated that. And so I wanted to always and I will always acknowledge the fact that she was a tremendous team player as part of my leadership team. However, the productivity of what that department needed to be and continuing to build and grow our institution, I finally had to accept and acknowledge that that wasn't happening.

*Id*. at p. 31-32.

---

[7] Neither party submits Ford-Kee's employee evaluations for years 2013-2019 for comparison. However, Ford-Kee indicated on her EEOC charge that she "had not received any adverse performance evaluations or reprimands." [49], Ex. 1 at p. 7.

The University argues that "Ford-Kee was evaluated based on her ability to lead and manage the athletic department effectively…[she] was held accountable when she did not meet the leadership and operational goals set for her position. The very performance metric she applied to others was mirrored in the decision to terminate her employment." [50] at p. 17. However, the University does not cite any portion of the record to support this argument. While Briggs testified that he had general discussions about the teams' underperformance with Ford-Kee prior to this evaluation, Ford-Kee stated in her sworn declaration that Briggs never attributed the athletic loss record to her performance, and that, other than the comments he left on her November 2021 evaluation, she was unaware that the teams' win-loss record would have any effect on her performance evaluations or her continued employment. [53], Ex. 3 at p. 4.

It is undisputed that Briggs did not give Ford-Kee lower ratings on her performance evaluations as a result of the athletic teams' underperformance—including the November 2021 evaluation just three months prior to her termination. Ford-Kee was given stellar evaluation ratings and the teams' underperformance was not documented as a negative reflection of her work as Athletic Director. To the contrary, while Briggs noted the teams' underperformance in his comments, he specifically rated her as exceeding expectations in the areas that measured her work results and problem solving skills, as defined on the form. Briggs did not testify that he otherwise criticized Ford-Kee's work on the basis of the teams' underperformance despite their numerous discussions regarding the subject over the years. Again, in her sworn declaration, Ford-Kee asserts that Briggs had not suggested that he was considering her termination, never told her that the teams' loss record was her fault, and never communicated to her that the athletic teams' performance had an effect on her work evaluations. *See* [53] at p. 4-5. In short, viewing this evidence in light most favorable to Ford-Kee, it certainly calls into question the sincerity of the

University's proffered reason. *See Ontiveros v. Asarco Inc.*, 83 F.3d 732, 734 (5th Cir. 1996) (finding a question of fact as to pretext in a Title VII failure-to-promote action where employee pointed to evidence that employer failed to point to any one specific incident indicating employee's poor performance, that employer never brought the alleged deficiencies to the employee's attention nor criticized employee's work based on the alleged deficiencies, and that employee's alleged shortcomings were not documented by anyone).

Furthermore, Ford-Kee points to Briggs' deposition testimony to support her position that Briggs failed to inform her that her work performance was being measured by the teams' win/loss record or otherwise criticize her work on this basis before firing her during the February 8th meeting. In his deposition, Briggs testified that he did not discuss the teams' underperformance with Ford-Kee during the February 8th meeting during which she was informed of her termination:

> Q.    Okay. You had the meeting with Dianthia to tell her that she was being terminated on February 8th, 2022; is that correct?
>
> A.    I believe so, yes.
>
> Q.    Okay. What did you tell her?
>
> A.    I told her basically that it was time to really change leadership for the athletic division –
>
> Q.    Okay.
>
> A.    -- based on the circumstances surrounding the teams, really the lack of production as far as how we're going to move forward, how we're going to change this trajectory that we were in from a win/loss standpoint and really the fact that the departments -- the department wasn't growing. And there wasn't any indication at the time that things were going to change.
>
> Q.    So did you two specifically discuss the performance of sports teams in that meeting?

> A.    I can't say we discussed it in that meeting. I know we discussed it before that. We've had several conversations throughout the years about the lack of performance of the teams.

[53], Ex. 2 at p. 14.

Ford-Kee also argues that this testimony contradicts a statement the University provided to the EEOC and that this too demonstrates pretext. Specifically, she points to the following statement in the University's EEOC response: "In the months prior to her separation of employment from [the University], [Briggs] shared the lack of adequate performance of MVSU athletic teams, and when it became clear that her employment would end due to such, the departure was amicable." [53], Ex. 7 at p. 2. Again, Ford-Kee alleges she learned about the University's proffered reason upon viewing this EEOC response several months *after* her departure.

"A jury may view erroneous statements in an EEOC position statement as circumstantial evidence of discrimination." *Burton v. Freescale Semiconductor, Inc.*, 798 F. 3d 222, 237 (5th Cir. 2015) (quoting *Miller v. Raytheon Co.*, 716 F. 3d 138, 144 (5th Cir. 2013)) (internal quotations and alteration omitted). Notably though, in cases where the Fifth Circuit has noted "inconsistent *rationales*" provided in EEOC responses, this alone has not been sufficient evidence of pretext without other "strong" evidence of pretext. *See Bennett v. Consol. Gravity Drainage Dist. No. 1*, 648 F. App'x 425, 430 (5th Cir. 2016) (finding no evidence of pretext beyond alleged inconsistencies with EEOC response) (emphasis added); *see also Hightower v. Fam. Health Care Clinic, Inc.*, 2022 WL 866264, at *17-18 (S.D. Miss. Mar. 22, 2022) (citing *Bennett,* 648 F. App'x at 430). In this case, the University's alleged misstatement to the EEOC has to do with whether they informed Ford-Kee of their rationale *before* her departure, but not relative to the proffered reason itself. The University maintains the same reason for Ford-Kee's termination in its EEOC response, stating that the decision "begins and ends with the demonstrated underperformance of

13

MVSU Athletics teams during her tenure." [53], Ex. 7 at p. 2. Nonetheless, the misstatement could potentially offer "circumstantial evidence of discrimination" when viewed together with other evidence of pretext. *Burton*, 798 F. 3d at 237; *Hightower*, 2022 WL 866264 at *18 (recognizing an exaggerated statement made by the employer to the EEOC as "scintilla pretext evidence"). This brings the Court to Ford-Kee's argument that the University's proffered reason has evolved during litigation and is contradicted.

On that point, Ford-Kee argues that the University has raised her "across-the-board job performance" for the first time in this litigation. [54] at p. 18. She points to the University's Memorandum [50] wherein the University contends that Ford-Kee "contributed to the effort to make Pell Grants refundable to student-athletes….but outside of this, [she] made no other achievements within the athletic department." [50] at p. 14.

In its Reply [59], the University maintains its position that it terminated Ford-Kee based on the underperformance of athletic teams.

In the Court's view, the University's contention that Ford-Kee "made no other achievement within the athletic department" concerns poor work performance—its overarching rationale for terminating Ford-Kee has not changed. The Court acknowledges that in its EEOC and discovery responses, the University appears to limit its example of Ford-Kee's poor work performance to the underperformance of teams, specifically stating that its decision "begins and ends" with that issue. [53], Ex. 7 at p. 2; Ex. 10 at p. 8. However, in *Burton*, the Fifth Circuit recognized that "shifting examples of poor performances" do not necessarily suggest pretext. *Burton*, 798 F. 3d at 238. But "[w]here the 'examples' first given have proven illegitimate…a jury could reasonably infer that the shift in explanation is significant." *Id*. at 238-239. Whether the underperformance of teams is

a legitimate example of Ford-Kee's poor work performance, which she disputes as previously noted, is a question for the jury.

Finally, Ford-Kee argues that the University has provided after-the-fact rationalizations to support her termination. As noted, Ford-Kee alleges that she first learned that the University allegedly terminated her due to the athletics teams' underperformance when the University submitted its EEOC response.[8] Additionally, she points to the 2021-2022 employee evaluation completed by Briggs in September 2022. Briggs completed the evaluation *after* her termination and *after* she filed an EEOC charge and denoted an "improvement necessary" rating under "work results" and an "unsatisfactory" rating under "creativity and innovation." [53], Ex. 9 at p. 11, 16.

In its Reply [59], the University argues that the "major flaw with this argument is Briggs and Ford-Kee were friends and until the filing of this suit, he was under the impression that there were no issues, after all there had been multiple discussions about the teams' performance. Thus not warranting yet another discussion about the undisputed performance of the teams." [59] at p. 9. The University does not otherwise refute Ford-Kee's argument.

In his deposition, Briggs testified that it was important to submit the "improvement necessary" rating in Ford-Kee's 2021-2022 evaluation:

> Q.     All right. And then if we go to work results, it says, "Improvement necessary."
>
> A.     Yes.
>
> Q.     Do you see that?
>
> A.     Yes.
>
> Q.     And did you believe that, when you filled this out, to be true for Dianthia?

---

[8] Ford-Kee also provided the EEOC with a supplemental information statement alleging that her termination letter did not give a reason for her termination. *See* [49], Ex. 1 at p. 5.

> A.     Yes.
>
> Q.     And why is that the case?
>
> A.     Because under -- if you look at that category, again, we were underperforming. And so --
>
> Q.     The wins/losses that you've been talking about?
>
> A.     Yes.
>
> Q.     Okay. And that was true when you filled this out in 2022. Was that also true for prior years?
>
> A.     It could be, yes. I may not have indicated that in prior years. But for that year here, it was paramount that it be indicated.

[53], Ex. 2 at p. 27-28.

After recalling that this evaluation was documented after Ford-Kee had been terminated, he testified as follows:

> Q.     …Would you say that in December of 2021 improvement was also necessary for Dianthia on the work results competency?
>
> A.     It was probably necessary. Now, was it indicated on her evaluation, I can't recall that. Necessary? Probably so.

*Id*. at p. 29.

While there is a dispute as to when Ford-Kee was informed that she was terminated for poor work performance, an unfavorable employee evaluation documented by the decision-maker, Briggs, only after Ford-Kee had filed her EEOC charge certainly casts doubt on the University's proffered reason. *See Desai v. Invesco Grp. Servs., Inc.*, 2021 WL 742889, *10 (S.D. Tex. Feb. 10, 2021) (explaining in a FMLA retaliation case that a jury could find a "post hoc rationalization" to support an employment decision "open[s] the door for a fair-minded jury to infer that [an employer's] stated justification is disingenuous."); *see also Burton*, 798 F. 3d at 236 ("[e]vidence

of a sudden and unprecedented campaign to document [employee's] deficiencies and thus justify a decision that had already been made, however, could raise an inference of pretext") (citing *Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F. 3d 470, 476–77 (5th Cir. 2015)).

Overall, taking all of these facts into account, there is a factual dispute as to the University's reason for terminating Ford-Kee. The Court finds that she has come forward with sufficient evidence to preclude summary judgment as to whether the University's proffered reason is worthy of credence.

ii.     *Gender as the Real Reason or a Motivating Factor*

Additionally, there is evidence from which a jury can infer that the reason for Ford-Kee's termination was discrimination. *See Owens*, 33 F.4th at 834. Ford-Kee argues that "there is evidence that gender discrimination in the community influenced [Briggs] when he decided to terminate [her]." [54] at p. 19. In response, the University avers that Ford-Kee fails to present evidence that Briggs made any comment about her gender and that she has not otherwise established that gender motivated Briggs in his decision.

In his representative capacity on behalf of the University, Briggs testified that he was told by "hundreds of people" that he should terminate Ford-Kee. [53], Ex. 5 at p. 27. He testified that these persons included people at alumni events and members of the "V Club"—the athletic foundation which is a formal affiliate group of the University. When asked about the members of the "V Club" who would make the comments that he should terminate Ford-Kee, Briggs testified as follows:

> Q.     Was there ever an event at the V Club where V Club members told you that they thought it was time to let Dianthia go?
>
> A.     There was never an event. There were individuals who were part of the V Club.

17

> Q.      Do you remember who those individuals were, the ones that were part of the V Club?
>
> A.      I can't recall specific names, no.
>
> Q.      But members of the V Club did recommend to you that Dianthia should be terminated?
>
> A.      Again, hundreds of people recommended that.
>
> Q.      Okay. And that did include members of the V Club?
>
> A.      Yes.

*Id.* at p. 43.

In his individual capacity, Briggs testified that resentment from the community regarding the athletic teams' record turned on him "because of the fact that [he] would not listen or [he] would not kowtow to what others thought [he] should be doing or needed to be doing because of their *bias*." [53], Ex. 2 at p. 35-36 (emphasis added). He testified that this resentment came from "people on the street," "people in Walmart," and "people, you know, at events." *Id.* at p. 42. However, when asked who these persons were making comments to him about Ford-Kee, Briggs refused to provide any names:

> Q.      So, to the best of your recollection, who were the specific people that you remember making those type of comments to you?
>
> A.      I'm not going to give you any name.
>
> Q.      Okay. So you're choosing not to answer that question; is that correct?
>
> A.      Yes.

*Id.* at p. 43.

When asked about these unnamed persons' bias, he testified that this included gender bias

as to Ford-Kee:

> Q.    When you talked about their bias, would that have included
>       people who are biased against Dianthia Ford-Kee because
>       she was a woman athletic director that might have been
>       shouting at you earlier that you referenced?
>
>       …
>
> A.    So were there people who were biased because of her as a
>       woman? I would say yes. Were there people who were
>       biased because of her because of other things? Maybe so.
>       But that's life in general. There are people who are biased
>       because of me because of different things. So, to answer your
>       question, in a general term, yes.

*Id*. at p. 43-44.

Furthermore, Dameon Shaw, the University's Vice President of Information Technology,

testified that he would hear alumni make comments about Ford-Kee:

> Q.    Okay. All right. During the time that you were working there
>       and that Dianthia was working there, do you recall anybody
>       at all making comments about Dianthia and the fact that she
>       was a woman AD?
>
> A.    Just in passing, you know, like alums or -- out of frustration
>       you know. They didn't say anything – well, I'll put it like
>       this: I've never said – heard anyone say she's not good
>       because she's a woman, but I've heard them say, "That
>       woman don't know what she's doing."

[53], Ex. 12 at p. 22.

Given this testimony, there is evidence that the public at large persistently made critical

comments about Ford-Kee to Briggs because of her gender.

The Court is cognizant that Ford-Kee has not come forward with any specific evidence that

Briggs *himself* made any comment about her gender. However, "[i]f the employee can demonstrate

that others had influence or leverage over the official decisionmaker… it is proper to impute their

discriminatory attitudes to the formal decisionmaker. *Russell v. McKinney Hosp. Venture*, 235 F. 3d 219, 226 (5th Cir. 2000) (citing *Long v. Eastfield College,* 88 F.3d 300, 307 (5th Cir.1996)) (stating in a Title VII case that if the official decisionmaker "merely rubber stamped" the wishes of others, that decisionmaker would inherit the discriminatory taint).

Here, there is evidence in the record that Briggs received pressure from "hundreds of people," potentially including alumni and members of the "V Club," to terminate Ford-Kee and that some of these unnamed persons made gender-biased comments about her to Briggs. The fact that Briggs willfully declined to provide the names of the persons who made the comments to him about Ford-Kee certainly raises the question of whether their identity would reveal that they had any leverage over Briggs—particularly if these persons were members of the "V Club," and therefore affiliated with the University, or if they were influential alumni, or employees of the University. There is also evidence that, although having never previously given Ford-Kee a negative performance review, Briggs terminated Ford-Kee for poor performance and replaced her with a male. Viewing this evidence in light most favorable to Ford-Kee, a jury could infer that Briggs' decision to terminate her was based on discriminatory animus. Thus, genuine issues of material fact remain, such that summary judgment is not appropriate.[9]

## II.    *ADEA Age Discrimination*

As noted above, in addition to her gender discrimination claim, Ford-Kee also asserts an ADEA claim against the University, alleging that she was unlawfully discriminated against because of her age when she was terminated.

---

[9] Ford-Kee also argues that she can alternatively succeed on her Title VII claim under the mixed-motives alternative because Briggs was motived by her gender in reaching his decision to terminate her. *See Davis*, 372 F. App'x at 519. The Court notes that even if the proffered reason was true, based on the evidence related to the public's comments to Briggs, a jury could infer that Ford-Kee's gender was at least a motivating factor in her termination.

Under the ADEA, an employer cannot "discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1); *see also Rachid v. Jack In The Box, Inc.,* 376 F. 3d 305, 308–09 (5th Cir.2004).[10] "To establish an ADEA claim, the plaintiff must show that his age was the 'but for' cause of his termination—proving that age was a 'motivating factor' for the decision is not enough." *McMichael v. Transocean Offshore Deepwater Drilling, Inc.*, 934 F.3d 447, 455 (5th Cir. 2019) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180, 129 S. Ct. 2343, 174 L. Ed. 2d 119 (2009) (additional citations omitted)). A plaintiff may prove that age was the "but-for" cause of his termination with direct or circumstantial evidence. *Id*. at 455-56.

As with Ford-Kee's Title VII claim, the *McDonnell Douglas* framework applies to her ADEA claim. *See Bauer v. Albemarle Corp*., 169 F.3d 962, 966 (5th Cir. 1999).

The application of the *McDonnell Douglas* framework as to Ford-Kee's age discrimination claim is largely synonymous to her gender discrimination claim. "The first three elements of a prima facie case of age discrimination under the ADEA and gender discrimination under Title VII are identical." *Id*. As to the fourth element, the plaintiff must show that "she was either i) replaced by someone outside the protected class, ii) replaced by someone younger, or iii) otherwise discharged because of her age." *Id*. Ford-Kee satisfies a prima face case of age discrimination because she meets the first three elements and her replacement (McClellan) is not within her protected class and is significantly younger than her.

As for the second step of the analysis, the University relies upon the same legitimate, non-discriminatory reason for terminating Ford-Kee: underperformance of the athletics teams.

---

[10] The ADEA protects from discrimination persons at least 40 years of age. *See* 29 U.S.C. § 631(a).

As to the third step of the *McDonnell Douglas* framework, Ford-Kee relies upon the same arguments as to pretext set forth above. In an ADEA case, "[e]vidence demonstrating the falsity of the defendant's explanation, taken together with the prima facie case, is likely to support an inference of discrimination even without further evidence of defendant's true motive." *Sandstad*, 309 F. 3d at 897 (citing *Reeves*, 530 U.S. at 147-48, 120 S. Ct. at 2108-09). "Thus, the plaintiff can survive summary judgment by producing evidence that creates a jury issue as to the employer's discriminatory animus or the falsity of the employer's legitimate nondiscriminatory explanation." *Id*.

As detailed more fully above, the Court has explained at length that there exist questions of fact as to pretext which preclude summary judgment. More specifically, the Court has extensively explained that Ford-Kee has presented evidence that the University's proffered reason for her termination is unworthy of credence.

Additionally, there is undisputed evidence that Ford-Kee was replaced by a younger person, McClellan, who was 35 years-old at the time he was hired as the new Athletic Director. The Supreme Court has explained that the "fact that a replacement is substantially younger than the plaintiff is a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class." *O'Connor v. Consol. Coin Caterers Corp*., 517 U.S. 308, 313, 116 S. Ct. 1307, 134 L. Ed. 2d 433 (1996). "Replacement of a worker with someone who is substantially younger may indicate a strong prima facie case." *Inmon v. Mueller Copper Tube Co., Inc.*, 757 F. App'x 376, 381 (5th Cir. 2019) (citing *O'Connor*, 517 U.S. at 313, 116 S. Ct. 1307). Thus, to create an inference of age discrimination, McClellan must be considered *substantially younger* than Ford-Kee.

Here, not only was McClellan not within Ford-Kee's protected class but there was also a 27-year age difference between them making Ford-Kee's replacement substantially younger than her. *See Flanner v. Chase Inv. Servs. Corp.*, 600 F. App'x 914, 919 (5th Cir. 2015) (holding "no doubt" that a difference of twenty-seven years was "substantially younger"). Given this substantial age gap between the two, along with the additional evidence discussed previously, a jury could infer that Ford-Kee was terminated because of her age.

"At the end of the day, the pretext inquiry asks whether there is sufficient evidence 'demonstrating the falsity of the employer's explanation, taken together with the prima facie case,' to allow the jury to find that discrimination was the but-for cause of the termination." *Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 478 (5th Cir. 2015) (quoting *Sandstad*, 309 F. 3d at 897).[11] In this case, viewing the evidence in light most favorable to Ford-Kee, the Court finds that her strong prima facie case combined with the sufficient evidence that casts doubt on the University's proffered reason for her termination creates a genuine issue of fact as to pretext and whether age was the but-for cause of her termination. *See Flanner*, 600 F. App'x at 920 (finding in an ADEA case that the plaintiff's strong prima facie case together with evidence that the employer's justification was false or unworthy of credence was sufficient to overcome summary judgment and reversing the district court's grant of summary judgment in favor of the employer). Accordingly, summary judgment is not appropriate as to Ford-Kee's ADEA claim.

*Conclusion*

For the reasons set forth above, the University's Motion for Summary Judgment [49] is GRANTED IN PART AND DENIED IN PART.

---

[11] And notably, "but-for cause does not mean [the] sole cause." *Leal v. McHugh*, 731 F. 3d 405, 415 (5th Cir. 2013).

Ford-Kee will be permitted to proceed to trial against Mississippi Valley State University on her Title VII and ADEA discrimination claims based on wrongful termination. All other claims are DISMISSED *with prejudice*. All claims against IHL are hereby DISMISSED, and the Clerk of Court shall terminate IHL as an active defendant in this litigation.

SO ORDERED, this the 17th day of December, 2024.

/s/ Sharion Aycock
UNITED STATES DISTRICT JUDGE